IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

H.W.,

       Plaintiff,

  vs.              Case No. 20-CV-02507

McLOUTH UNIFIED SCHOOL DISTRICT 342 and
STEVEN LILLY,

       Defendants.

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, McLouth Unified School District No. 342 (USD 342) and Superintendent Steven Lilly (Lilly), move, pursuant to Fed. R. Civ. P. 56, for judgment as a matter of law. Their memorandum in support follows.

### NATURE OF CASE

High school science teacher Anthony Kuckelman had secret sexual relations with student H.W. from January 2018 until she graduated in May 2019. H.W. never told a USD 342 administrator about the sexual relations. She reported the unlawful relations to law enforcement in May 2020, upon which Kuckelman was arrested and resigned.

In October of 2018, H.W. was seen leaving Kuckelman's classroom on a non-school day. Superintendent Lilly questioned H.W. about it and her relationship with Kuckelman with her parents present. H.W. said she was just getting help with homework and that Kuckelman was never inappropriate. H.W.'s parents agreed that H.W. was getting help with homework and stated they weren't concerned. Now H.W. brings claims against USD 342 and Lilly for violations of Title IX

and her Fourteenth Amendment Equal Protection and Substantive Due Process rights based on their knowledge of and deliberate indifference to the sexual abuse. She also brings a state negligence claim for defendants' failure to prevent the unlawful sexual relations.

Defendants are entitled to judgment as a matter of law because they only gained actual knowledge of the sexual abuse upon Kuckelman's arrest and responded reasonably to the limited information they had beforehand.

## STATEMENTS OF FACT

1.      H.W. was a student at McLouth Unified School District until she graduated in May 2019. (Pretrial Order Stipulation (2)(a)(1) Doc. 56).

2.      Anthony Kuckelman was a high school science teacher from August 2013 until May 2020. (Kuckelman Dep. 7:5-7:25) (Pretrial Order Stipulation (2)(a)(2) Doc. 56).

3.      H.W. and Kuckelman had sexual relations from January 2018 until she graduated in May 2019. (H.W. Dep. 117:2-120:6; 132:24-134:10).

4.      H.W. and Kuckelman had sexual relations at school beginning in February 2018. (H.W. Dep. 123:17-25).

5.      H.W. went to Lawrence to have sexual relations with Kuckelman four times and spent the night at his house twice. (H.W. Dep. 128:1-6; 130:7-12).

6.      Janna Davis has been the high school principal since the fall of 2015. (Davis Dep. 9:11-22).

7.      Steven Lilly has been the superintendent of McLouth USD 342 since the fall of 2014. (Lilly Dep. 6:11-20).

8.      Mark Lackey was the McLouth High School assistant principal from August 2018 to May 2021. (Lackey Dep. 7:16-8:1).

9.     The average enrollment for grades 6-12 at McLouth is 250 students, with most grades having between 35 and 40 students. (Davis Dep. 78:24-79:1) (Patterson Dep. 7:12-13).

10.     Kuckelman taught H.W. Chemistry II her junior year. Three students were enrolled in the class but two dropped at semester. (H.W. Dep. 77:16-20; 78:13-79:1).

11.     Alyssa Floro was a science teacher at McLouth at all times pertinent. (Floro Dep. 7:4-17).

12.     As a small school and there are occasions where teachers and students are one-on-one, such as tutoring, teaching or para support. (Lilly Dep. 13:11-16).

13.     Teacher Alyssa Floro testified she met with several students one-on-one for various reasons at school outside of school hours, as did other teachers. (Floro Dep. 44:19-45:23).

14.     Kuckelman and H.W. began communicating via Instagram in December 2017. The two continued to communicate via Instagram. (H.W. Dep. 79:24-81:4; 83:12-84:3).

15.     H.W. deleted the Instagram communications because she was trying to hide the relationship. (H.W. Dep. 84:9-85:8).

16.     H.W. did not express any concern to the McLouth administration about being the only student in the Chemistry II class in part because she was worried she would be unable to stay in the class. (H.W. Dep. 89:12-91:18).

17.     Jennifer Weissenbach, H.W.'s mother, in the Spring of 2018, asked Davis if it was "weird" or "Kosher" for H.W. to be the only student in Kuckelman's class. Davis responded that she "did not need to worry", that "the door would be open," and "they would be checked on, there would be no opportunity for anything bad to happen." (Weissenbach, Jennifer Dep. 40:6-23).

18.     Davis checked on Kuckelman's Chemistry II class the same as she would any other class, "walk-throughs, walk-byes, poke your head in, general checking on making sure that

students were at work and teachers were instructing them." (Davis Dep. 6:6-20). Davis recalls checking in on Kuckelman's Chemistry II class. (Davis Dep. 7:15-17).

19.     Davis does not recall an occasion when Kuckelman's door was shut. It was not reported to Davis his door was shut. It would be her practice to peer into a window of a shut door or to open the door if she observed it shut. (Davis 78:8-23).

20.     Davis does not recall Jennifer Weissenbach expressing any concern H.W. was the only student remaining in the Chemistry II class. (Davis Dep. 8:6-11).

21.     Davis and Lilly did not know H.W. was the only student in Kuckelman's Chemistry II class at the time. (Davis Dep. 70:1-15) (Lilly Dep. 15:25-16:4).

22.     No one told Lilly H.W. was in Kuckelman's room alone with the door shut. Lilly had no knowledge H.W. was ever in a room alone with Kuckelman with the door shut. (Lilly Dep. 128:2-9).

23.     There was no policy against one-on-one classes. (Davis Dep. 70:16-20).

24.     Davis agrees it is not common practice or best practice to have a single student class. (Davis Dep. 70:16-22).

25.     There was no school policy prohibiting teacher student communications on social media. (Davis Dep. 73:14-24). Davis instructed her teachers not to use social media to communicate with students. (Davis Dep. 73:25-74:11).

26.     A number of teachers "blocked" H.W. and friends from following them on Instagram, including Kuckelman, initially. (H.W. Dep. 79:12-25).

27.     There were rumors that another teacher (MacNeil) was in a relationship with a student and of his inappropriate social media usage. (Davis Dep. 37:8-42:14; 54:20-24).

28.     The Department of Family Services was contacted. (Davis Dep. 52:16-19).

29.     It was determined that nothing inappropriate occurred. (Davis Dep. 59:23-25).

30.     Lorie Patterson is the business manager and board clerk for McLouth USD 342. (Patterson Dep. 5:13-15).

31.     Patterson's daughter K.P. was in H.W.'s class at McLouth. (Patterson. 6:15-21).

32.     K.P. called Patterson, on a day when there was no school, and told her that she had observed H.W. coming out of Kuckelman's class door and when H.W. saw them she ducked behind a brick wall, and they thought that was odd. K.P. also reported that H.W.'s dad's car was parked across the street at the church which was an unusual place to park when the school lot only had a handful of vehicles. (Patterson Dep. 8:23-9:14).

33.     H.W. met Kuckelman at school that day, it was a Friday, October 2018, after she had lunch with the volleyball team to commemorate the end of the season. There was a football game that evening. (H.W. Dep. 138:2-139:15). The two had sex. (H.W. Dep. 140:9-13).

34.     The year before K.P. had told Patterson that H.W. would often ask Floro to leave advisory to go to Kuckelman's room to play hacky sack. Both Floro's room and Kuckelman's room would have other students present during the advisory period. Patterson relayed this information to Lilly. (Patterson Dep. 10:9-24; 12:18-13:1).

35.     Patterson had not heard any rumors about H.W. and Kuckelman. (Patterson Dep. 10:25-11:2).

36.     Late that Friday afternoon, Patterson called Lilly and told him that K.P. and her friend had observed H.W. leaving Kuckelman's door and she thought that was odd and K.P. thought it was odd, so she told Lilly. (Patterson Dep. 11:7-11) (Lilly Dep. 19:12-20:24).

37.     At the time Patterson was not concerned there was something going on between H.W. and Kuckelman and she did not tell Lilly of any rumors. (Patterson Dep. 11:25-12:6).

38.     Patterson told Lilly female classmates had reported an odd or unusual relationship between H.W. and Kuckelman. Lilly understood this to mean the girls had reported H.W. followed Kuckelman around and acted more like his equal than student and teacher. (Lilly Dep. 20:7-21:8).

39.     The following Monday morning Lilly reviewed the surveillance footage from the exterior and interior cameras around Kuckelman's room from the prior Friday. (Lilly Dep. 23:9-14). Monday and Tuesday were teacher workdays. (Lilly Dep. 30:24-25; 53:1-6).

40.     The footage stored from the cameras is limited and the footage is written over approximately every 20 days. (Lilly Dep. 26:4-14). The cameras are not monitored during school hours. (Lilly Dep. 26:15-27:1).

41.     The video corroborated what had been reported by Patterson. Lilly observed Kuckelman leave his classroom via the exterior door in a normal non-suspicious fashion. (Lilly Dep. 28:9-29:5).

42.     After viewing the video Lilly first consulted Janna Davis and showed her the video, second, he contacted the school resource officer, Sergeant Clay McHardie of the Jefferson County Sheriff's Department, and advised him of the video, and third, he contacted H.W.'s parents and requested a meeting. (Lilly Dep. 30:13-18).

43.     Lilly believed the situation was odd or different, because he did not know what was going on he wanted to investigate. (Lilly Dep. 31:9-22).

44.     Lilly provided McHardie all the information he had at the time. (Lilly Dep. 33:3-6). The first phone call occurred at 2:07 p.m. and lasted 7.7 minutes. (Bates No. 152, Phone Record) (Lilly Dep. 61:13-64:24).

45.     Lilly called Scott Weissenbach at 3:35 p.m. (Bates No. 152, Phone Record).

46.     Lilly called McHardie a second time at 3:47 p.m. that call lasted 5.3 minutes. (Bates No. 152, Phone Record).

47.     McHardie does not dispute the accuracy of the phone records. McHardie cannot remember the substance of those phone conversations. (McHardie 17:13-18:21).

48.     McHardie denies anyone told him about a relationship between Kuckelman and H.W., until H.W. reported it in May 2020. (McHardie Dep. 18:24-19:10).

49.     Lilly and Davis met with Scott and Jennifer Weissenbach. All watched the video. (Lilly Dep. 39:5-41:17).

50.     Jennifer Weissenbach did not think much of the report or video because H.W. had told her she was going to school that afternoon to get help with her homework. (Weissenbach, Jennifer Dep. 31:11-25).

51.     Jennifer Weissenbach told Lilly she had heard kids teasing H.W. about Kuckelman. She also told him there was a rumor about her and her band teacher when she was in high school and nothing had ever happened. Her perspective was "kids will talk." She did not think anything was going on. She believed H.W. (Weissenbach, Jennifer Dep. 31:3-25; 32:11-23).

52.     Scott Weissenbach also believed H.W. that nothing was going on with Kuckelman. (Weissenbach, Scott Dep. 33:1-34:1).

53.     H.W. met the group at the school. Lilly asked H.W. what she was doing at school that day and she advised she was getting help from Kuckelman on schoolwork. Lilly asked her if there had ever been a situation where she had felt uncomfortable around Mr. Kuckelman, if he had ever been inappropriate in any way, if there had been a sexual relationship. H.W. responded "no" to all questions. Lilly believed H.W. was telling the truth. (Lilly Dep. 44:20-46:2).

54.     When asked why she hid, H.W. said she had a hard time with the girls who had driven by and wanted to avoid them making fun of her. She didn't want people to assume something was going on when it was not. (Lilly Dep. 128:20-129:5) (H.W. Dep. 147:8-13).

55.     The Weissenbach's told Lilly they did not believe there was anything going on and they believed H.W. when she said she was getting help with her homework. They were not concerned. (Lilly Dep. 129:6-25).

56.     At this point Mr. Lilly did not have reason to believe there was an inappropriate relationship between H.W. and Kuckelman. (Lilly Dep. 49:9-14).

57.     That evening H.W. told Kuckelman what she had told Lilly and Davis. (H.W. 161:7-13).

58.     The following day was a professional development day at the school. Lilly and Davis met with Kuckelman. Kuckelman denied anything inappropriate between he and H.W. Kuckelman's information matched H.W.'s. (Lilly Dep. 53:1-55:10).

59.     Lilly cautioned Kuckelman about being alone with a student. (Lilly Dep. 75:12-19) (Davis Dep. 34:1-6).

60.     Lilly did not believe anything inappropriate had occurred between H.W. and Kuckelman. (Lilly Dep. 56:3-6).

61.     Lilly updated McHardie on the investigation. McHardie told Lilly, "you've done everything that you can do in this situation."  . . . "You've contacted me, you have contacted the authorities. You've investigated. You've done everything that you can." (Lilly Dep. 59:22- 60:5).

62.     Lilly did not retain a copy of the video or prepare a report of this investigation because he did not think there was anything to document. (Lilly Dep. 70:8-17).

63.     Nothing regarding H.W. and Kuckelman was brought to Lilly's attention after this incident. (Lilly Dep. 60:23-61:3).

64.     Lilly did not suspect abuse or neglect such to trigger BOE Policy 6.44. (Lilly Dep. 79:7-11).

65.     Following the October meeting with Lilly and Davis, H.W. told her parents of rumors going around the school about her and Kuckelman and how it sucked and that the rumors were not true. (H.W. Dep. 151:10-20).

66.     H.W. did not tell anyone what was going on with Kuckelman. (H.W. Dep. 164:7-13).

67.     Nobody told Davis of any concern or rumor about H.W. and Kuckelman. (Davis Dep. 8:1-5).

68.     Other than the October incident nobody told Lilly of any interactions or concerns of anything between H.W. and Kuckelman at any time between 2017 and 2019. (Lilly Dep. 17:18-18:22).

69.     Gary Freeman is a teacher and coach at McLouth. (Freeman Dep. 4:10-12).

70.     Freeman told his good friend, elementary principal Jeremy Johnson, that he had heard a rumor about H.W. and Kuckelman in the fall of 2018. (Freemen Dep. 10:17-11:3; 11:11-23).

71.     Freeman heard untrue rumors of himself having sex with students. (Freemen Dep. 15:20-16:14).

72.     Freeman never observed anything between H.W. and Kuckelman that made him uncomfortable. (Freeman Dep. 10:4-7).

73.     When Freeman heard the rumor about H.W. and Kuckelman it seemed like any other untrue rumor he'd heard in the past. (Freeman Dep. 24:12-18; 30:24-31:5).

74.     Jonah Willits, former classmate of H.W., said to H.W. in class one day, "You think 'cuz you're messing around with a teacher you can do whatever you want." According to Willits this statement was overheard by teacher Karen Baily who later sent Willits to the principal's office. (Willits Dep. 7:21-8:8).

75.     Willits met with Lackey, who asked him if he knew anything about this situation. To which Willits responded, "No." "I really don't. I was, like, just making a joke." "I really—I was just making a joke. That's my bad. I apologize for making a joke." (Willits Dep. 7:25-8:7).

76.     Willits told Lackey it was a "talked about thing." (Willits Dep. 8:24-9:1).

77.     When asked if he considered this a report, Willits testified: "No, not exactly to be real honest. Like, I didn't. I wasn't reporting it, I just - - I got called to the office and I was just saying what I needed to say so I could go back to class, basically." (Willits Dep. 9:20-25).

78.     Lackey told Willits not to spread rumors he did not know to be true and that unless Willits had some information not to talk about it. (Willits Dep. 12:25-13:8; 14:10-13).

79.     Lackey told Willits if you hear anything else to come and let him know. (Willits Dep. 22:8-13).

80.     Willits repeatedly testified he told Lackey he was joking; that it was a joke. (Willits Dep. 22:17-19; 8:2-7).

81.     Lackey did not receive a report or hear a rumor of any inappropriate relationship between H.W. and Kuckelman. (Lackey Dep. 10:22-11:4).

82.     Kuckelman was Floro's closest friend at work.  (Floro Dep. 24:22-25:15; 40:2-4). Their rooms connected. (Floro Dep. 13:8-14).

83.   Floro and H.W. also had a close relationship. H.W. would often confide in Floro when she was having friend trouble. (Floro Dep. 42:13-18).

84.   Floro heard students joking about H.W. and Kuckelman. To Floro it seemed like a big joke or just kids being mean. (Floro Dep. 20:15-21; 21:14-22:10).

85.   Floro never heard any rumors of anything going on between H.W. and Kuckelman. (Floro Dep. 19:11-16).

86.   Floro never had any thought there was anything between Kuckelman and H.W. (Floro Dep. 21:7-13).

87.   In April 2019 H.W. and her classmates put together a superlatives list for the yearbook. One student voted H.W. and Kuckelman best or cutest couple, he showed his selection to the class and they laughed. This upset H.W. and a friend told Floro. (H.W. 109:25-111:22).

88.   Karen Baily was a teacher at McLouth when H.W. attended. She did not hear any rumors of anything occurring between H.W. and Kuckelman. (Bailey Dep. 3:15-23; 10:4-7).

89.   Bailey was aware Kuckelman had a class alone with H.W. but she was not concerned. (Bailey Dep. 10:16-20).

90.   H.W. never told anyone, including students, her parents, or teachers about her sexual relationship with Kuckelman. (H.W. Dep. 74:25-75:16).

91.   Lilly learned Kuckelman had been arrested when the police came to search his classroom. (Lilly Dep. 67:21-24).

92.   Kuckelman pled guilty to unlawful sexual relations. (Pretrial Order Stipulation (2)(a)(6) Doc. 56).

93.   USD 342 Policy 6.57 provided:

> It shall be a violation of this policy for any student, employee or third party (visitor, vendor, etc.) to sexually harass any student,

employee, or other individual associated with the school. . . . Sexual harassment is unwelcome sexual advances, requests for sexual favors and other inappropriate oral, written or physical conduct of a sexual nature when made by a member of the school staff to a student or when made by any student to another student when: (1) submission to such conduct is made, explicitly or implicitly, a term or condition of the individual's education; (2) submission to or rejection of such conduct by an individual is used as the basis for academic decisions affecting that individual; or (3) such conduct has the purpose or effect of interfering with an individual's academic or professional performance or creating an intimidating, hostile or offensive academic environment.

Bates 428-30.

94.     USD 342 Policy 9.30 provided:

Staff members shall not have any interaction of a sexual nature with any student at any time regardless of the student's age or status or consent.

Bates 440.

95.     USD 342 Policy 6.44 provided:

Any district employee who has reason to know or suspect a child has been injured as a result of physical, mental or emotional abuse or neglect or sexual abuse, shall promptly report the matter to the local Kansas Department of Children and Families (DCF) office or to the local law enforcement agency . . . . The employee making the report will not contact the child's family or any other persons to determine the cause of the suspected abuse or neglect.

Bates 423-24.

96.     USD 342 Policy 6.45 provided:

Building administrators and others designated by the superintendent may conduct investigations and question students about infractions of school rules or the student conduct code.

If there is reason to believe a violation of a criminal law has been committed, the principal shall notify the appropriate law enforcement agency as necessary and may request further investigation of the alleged violation.

Bates 425.

97.     USD 342's policies were within the standard of care for Kansas. (Winter Dep. 67:1-10).

98.     USD 342 sexual harassment training was completed pursuant to Kansas requirements. (Winter Dep. 67:12-15).

99.     H.W. new it was against school policy for Kuckelman to have sex with her. (H.W. Dep. 115:22-24).

100. H.W. knew she could report the abuse to her teachers or administrators. (H.W. Dep. 194:6-19).

## ISSUES PRESENTED

1.      Count I: Because H.W. and her parents dispelled any concern regarding the October incident and no appropriate person was informed of any credible cause for suspicion, USD 342 lacked actual knowledge for Title IX liability.

2.      Counts II-V: Because there was no pattern of sexual harassment at USD 342, and Lilly did not acquiesce to Kuckelman's abuse, defendants lacked deliberate indifference for § 1983 liability, and Lilly is entitled to qualified immunity.[1]

3.      Count VI: Because defendants are immune under the Kansas torts claims and Coverdell acts and the sexual abuse was not reasonably foreseeable, defendants were not negligent.

## STANDARD

Summary judgment is proper when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the moving party has the initial burden of production, the moving party can carry the burden by merely pointing to an absence of evidence to support the non-movant's claim. *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000). A fact is

---

[1] Count VII names defendant Lilly in the heading in what would be a duplicative substantive due process claim. The allegations all concern Kuckelman, the intended subject of the count.

"material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.*

## ARGUMENTS AND AUHORITIES

There is no evidence that USD 342 or its employees (including defendant Lilly) had actual knowledge of Kuckelman's harm to H.W. Defendants were not negligent, were not deliberately indifferent, and did not cause injury to H.W. Defendants are entitled to judgment as a matter of law.

**I.    Because H.W. and Her Parents Dispelled Any Concern Regarding the October Incident and No Appropriate Person Was Informed of Any Credible Cause for Suspicion, USD 342 Lacked Actual Knowledge for Title IX Liability.**

"A school district may be liable under Title IX provided it (1) has actual knowledge of, and (2) is deliberately indifferent to, (3) harassment that is so severe, pervasive and objectively offensive as to (4) deprive access to the educational benefits or opportunities provided by the school." *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998). Because USD 342 lacked actual knowledge of the sexual abuse and was not deliberately indifferent, it is entitled to summary judgment.

**A.    USD 342 Lacked Actual Knowledge.**

The district can obtain actual knowledge only through an "appropriate person"—that is— an official with authority to take corrective action to end the discrimination. *Gebser*, 524 U.S. at 290 (finding a principal lacked actual notice and that the school district was not liable). H.W. attempts to rope in teachers' awareness as mandatory reporters, but their mandatory reporter status is irrelevant to Title IX liability. *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1289-90 (10th Cir. 2017) (holding that merely passing on a report does not make one an appropriate person). Teachers and

students lacked authority over Kuckelman and thus were not appropriate persons. What matters is whether Superintendent Lilly, Principal Davis, or Assistant Principal Lackey had actual knowledge, individually, requiring them to take corrective action.[2]

The actual knowledge requirement precludes district liability for merely failing "to react to teacher-student harassment of which it knew or *should have* known." *Davis*, 526 U.S. at 642. Here, H.W. did not express any concern to the administration about being the only student in the Chemistry II class. At the time of the October incident, Lilly was also made aware of classmate reports that there was an odd or unusual relationship between H.W. and Kuckelman, which he understood to mean that H.W. followed Kuckelman around and acted like his equal. (Lilly Dep. 20:7-21:8). Lackey heard a talked about joke that H.W. was messing around with an unspecified teacher. (Willits Dep. 7:25-8:7). Nobody told Davis of any concern or rumor about H.W. and Kuckelman. (Davis Dep. 8:1-5). "[R]umors, investigations, and student statements" that a teacher molested students have been held not to constitute "actual knowledge." *Shrum* ex rel. *Kelly* v. *Kluck*, 249 F.3d 773, 780 (8th Cir. 2001).

The only substantiated information any of the above three had was Mrs. Patterson's report that her daughter observed H.W.'s car parked across the street from the school and then saw H.W. leaving Kuckelman's classroom on a non-school day and duck behind a brick wall to avoid being seen. (Patterson Dep. 11:7-11) (Lilly Dep. 19:12-20:24). This report amounts only to an opportunity for inappropriate conduct. Nothing suggested sexual activity was afoot. Even so, the

---

[2] A collective knowledge theory is inconsistent with the actual knowledge and appropriate person requirements. *See Murrell v. School District No. 1*, 186 F.3d 1238, 1247 (10th Cir. 1999) (holding liability can be imputed to school district if "a school official who possessed the requisite control over the situation had actual knowledge of, and was deliberately indifferent to, the alleged harassment").

district interviewed H.W., her parents, and Kuckelman and were universally told that H.W. was getting help with schoolwork and hid to avoid teasing.

H.W. now criticizes school officials for believing her denials, but it is not enough that the district should have seen through the fabrication. *Compare Doe v. Edgewood Independent School District*, 964 F.3d 351 (5th Cir. 2020) (finding male student being dropped off at teacher's house after a school investigation revealed that it was with parental permission for schoolwork did not provide actual knowledge of sexual abuse of female student) and *Davis* v. *DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1373 (11th Cir. 2000) (finding student's complaint of P.E. teacher touching not actual knowledge because behavior could have been inadvertent), *with J.M. ex rel. Morris v. Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 452-53 (10th Cir. 2010) (finding actual knowledge when appropriate person informed that teacher and student behind a closed door in a motel room and that student was lying on the bed and that the teacher was a pedophile).

H.W.'s denial of abuse negates any issue of genuine fact as to actual knowledge at summary judgment. There is no case where a 16-year-old student denied abuse in circumstances such as these, and the court found a genuine issue on actual knowledge. Liability, when a district demonstrated willingness to remedy any abuse but was misled by the plaintiff, would defeat the purpose of the actual knowledge requirement. *Compare Gebser*, 524 U.S. at 289 ("Presumably, a central purpose of requiring notice of the violation "to the appropriate person" and an opportunity for voluntary compliance before administrative enforcement proceedings can commence is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures."). Accordingly, the Court should not find a genuine issue of fact on actual knowledge.

**B.      USD 342 Was Not Deliberately Indifferent.**

Because H.W. fails to show that an appropriate person in USD 342 had actual knowledge of Kuckelman's sexual harassment before his arrest, the Court need not consider whether USD 342 was deliberately indifferent. *See Rost*, 511 F.3d at 1121 (finding no need to consider deliberate indifference because the defendant district lacked actual knowledge).

*Arguendo*, H.W. criticizes the way USD 342 handled the information that it had but that is irrelevant to deliberate indifference. The deliberate indifference element is concerned with failure to remedy harassment not failure to obtain actual knowledge thereof. Schools can still be liable for failure to investigate but from a remedial standpoint (i.e. failure to seek proof for disciplinary or criminal charges purposes). *See Davis*, 526 U.S. at 654 ("[P]etitioner may be able to show both actual knowledge and deliberate indifference on the part of the Board, which made no effort whatsoever either to investigate or to put an end to the harassment."); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248 (10th Cir. 1999) ("[C]omplete refusal to investigate known claims of the nature advanced by [the victim], if true, amounts to deliberate indifference."); *see also Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300, 1304 (10th Cir. 2020) (finding deliberate indifference for failure to investigate after victim's report of rape and harassment when actual knowledge was not an issue).[3]

Even assuming the rumors and non-school day incident provided actual knowledge, district administrators were not deliberately indifferent. A district is deliberately indifferent "only where

---

[3] Dr. Charol Shakeshaft's extensive analysis on the deficiencies in USD 342's policies and procedures including the investigation and single-student class is largely irrelevant. Failure to comply with Title IX regulations (much less industry standards) "does not establish the requisite actual notice and deliberate indifference." *Gebser*, 524 U.S. at 291–92 (finding "failure to promulgate and publicize an effective policy and grievance procedure for sexual harassment claims" did not establish liability). The ability to enforce Title IX regulations lies with the Department of Education, not private litigants. *Id.* at 292. Any failure to comply with USD 342 policies is also irrelevant. *Rost*, 511 F.3d at 1122 (finding that the school's violation of its own policy "sound[ed] in negligence, not deliberate indifference").

the [district's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis,* 526 U.S. at 648. Here, USD 342 officials investigated, and an inappropriate relationship was universally denied, thus, dispelling actual knowledge.

## II.   Because There Was No Pattern of Sexual Harassment at USD 342, and Lilly Did Not Acquiesce to Kuckelman's Abuse, Defendants Lacked Deliberate Indifference for § 1983 Liability, and Lilly is Entitled to Qualified Immunity.

H.W. brings § 1983 claims against USD 342 and Lilly. Section 1983 provides an avenue of recovery when a "person" acting on behalf of a state, "causes" a deprivation of federal rights. 42 U.S.C. § 1983. In this case, H.W. has alleged violations of her substantive due process and equal protection rights under the Fourteenth Amendment. Defendants do not deny that Kuckelman violated H.W.'s Fourteenth Amendment rights. Defendants simply are not responsible for the violations.

### A.   Because There Was No Pattern of Sexual Harassment at USD 342, Establishment of a USD 342 Custom of Deliberate Indifference was Impossible.

According to the pre-trial order, H.W. asserts only an equal protection claim against USD 342 based on an unconstitutional policy, custom, or practice. Doc. 56 at 6.[4] A school district can be liable for its teachers' constitutional violations if representative of a district policy, custom, or practice including failure to train and supervise. *See Rost*, 511 F.3d at 1124–25. Because H.W. cannot show a genuine issue that Kuckelman's sexual abuse was representative of a policy, practice, or custom, judgment should be entered for defendants.

First, H.W. does not allege USD 342 had an official policy of allowing employees to sexually harass students or that an official with final policy making authority was responsible for the sexual harassment. *Compare Doe No. 1 v. Boulder Valley Sch. Dist. No. Re-2*, No. 11-CV-

---

[4] The petition also alleges a violation of H.W.'s liberty interest in bodily integrity. Defendants' arguments for summary judgment are the same for both.

02107-PAB-KLM, 2012 WL 4378162, at *8 (D. Colo. Sept. 25, 2012) (making same finding), *aff'd,* 523 F. App'x 514 (10th Cir. 2013). The absence, itself, of policies to prevent sexual abuse does not qualify as an official policy. *Aubert v. Cent. New Mexico Cmty. Coll.*, No. 18-CV-0118-WJ-LF, 2019 WL 1239435, at *9 (D.N.M. Mar. 18, 2019) (finding the absence of Title IX procedures not to be an official policy).

Second, H.W. cannot demonstrate a custom or practice of failing to train, supervise, investigate, or respond to sexual harassment complaints. To prove a custom of failure to receive, investigate, or act on complaints of constitutional violations, a plaintiff must demonstrate: "(1) a continuing, widespread, and persistent pattern of misconduct by the state; (2) deliberate indifference to or tacit authorization of the conduct by policy-making officials after notice of the conduct; and (3) a resulting injury to the plaintiff." *Rost*, 511 F.3d at 1125; *see also N.E.L. v. Douglas Cty.*, 740 F. App'x 920, 932 (10th Cir. 2018) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) ("When the liability theory rests on a [state actor's] 'failure to act,' the plaintiff must show that the [] inaction was the result of 'deliberate indifference.'")).

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003). Customs of failure to train and supervise are treated alike and similarly require a pattern of constitutional violations reflecting a deficiency in either to demonstrate deliberate indifference. *Whitewater v. Goss,* 192 F. App'x 794, 797-99 (10th Cir. 2006). "Evidence of a pre-existing pattern of violations is only unnecessary in a narrow range of circumstances, however rare, in which the unconstitutional consequences of a failure to train [or

other failure] are highly predictable and patently obvious." *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019) (quotation marks and citations omitted).

Here, H.W. can neither demonstrate a pattern of teacher misconduct supplying notice nor "a direct causal link between the policy or custom and the injury alleged." *Id.* at 1284. The only prior incident suggesting failure to handle social media for which H.W. can supply evidence is a complaint that a different teacher, MacNeil, engaged in inappropriate social media communications with students. The incident was reported to DCF, and it determined that there was no wrongdoing. Principal Davis instructed teachers not to use social media to communicate with students. (Davis Dep. 73:25-74:11). Even if the incident demonstrated a failure in supervision or training, one incident is not enough to demonstrate a pattern of misconduct supporting deliberate indifference. *Doe No. 1*, 2012 WL 4378162, at *5, 8-11 (finding perpetrator's previous inappropriate romantic calls to a student did not establish a pattern of or propensity to misconduct to support either district or superintendent liability for sexual abuse).

H.W. provides no evidence that USD 342 knew of sexual abuse of students before she reported her own to law enforcement. *Compare Jojola v. Chavez*, 55 F.3d 488, 491 (10th Cir. 1995) (finding the perpetrator's previous four incidents of inappropriate sexual behavior insufficient to state claim that principal had actual knowledge under § 1983 of pattern of violation of female students' constitutional right to be free of sexual abuse). Even if USD 342 violated Title IX, one violation cannot establish a custom. *See Murrell*, 186 F.3d at 1247-48, 1249 (where appropriate person had actual knowledge and was deliberately indifferent to multiple sexual assaults holding "acts of sexual harassment by a student directed solely at [the victim] do not demonstrate a custom or policy of the school district to be deliberately indifferent to sexual harassment as a general matter").

Any failings in training or supervision cannot be considered patently obvious considering the policies and training already in place. H.W. concedes that USD 342 prohibited sexual harassment with detail and required investigation and remedial action. Doc. 1 at 11-12. Here, USD 342's policies were within the standard of care for Kansas. (Winter Dep. 67:1-10). And the training was completed pursuant to Kansas requirements. (Winter Dep. 67:12-15).

Finally, as argued in defendants' motion to exclude the testimony of Charol Shakeshaft, Ph.D., H.W. cannot demonstrate a genuine issue that USD 342's alleged deficiencies in training, supervision, investigation, or responses resulted in her sexual abuse. Dr. Shakeshaft's opinions "uniformly partake of the post hoc, ergo propter hoc fallacy," rather than providing any evidence of how the deficiencies resulted in H.W.'s sexual abuse. *Carr*, 337 F.3d at 1231.

Accordingly, H.W. cannot demonstrate a genuine issue on a custom of deliberate indifference or causation. Thus, the § 1983 claim against USD 342 should be dismissed.

**B.    Because Lilly Did Not Acquiesce to H.W.'s Abuse, He Was Not Deliberately Indifferent and is Otherwise Shielded by Qualified Immunity.**

H.W. brings the same constitutional claims against Lilly on the theories that he failed to conduct a reasonable investigation of Kuckelman, follow policy, or protect her. Doc. 1 at 19 ¶ 93. "[A] governmental official or supervisory employee may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." *Murrell*, 186 F.3d at 1250. To state a claim of deliberate indifference, the plaintiff must prove that the employee participated in or "actually knew of and acquiesced in" the harassment. *Id.*

Here, H.W. cannot demonstrate that Lilly actually knew of Kuckelman's sexual abuse. Lilly had no knowledge H.W. was ever in a room alone with Kuckelman with the door shut. (Lilly Dep. 128:2-9). Lilly inquired about the non-school day visit and only dismissed the matter upon being assured it was innocent by H.W. and her parents. *See* Section I, *supra*. Other than the October

incident nobody told Lilly of any interactions or concerns of anything between H.W. and Kuckelman at any time between 2017 and 2019. (Lilly Dep. 17:18-18:22). Accordingly, there can be no genuine issue that Lilly lacked knowledge of the abuse.

*Arguendo*, Lilly cannot be said to have acquiesced in H.W.'s abuse. He investigated the October incident, informed law enforcement and H.W.'s parents of the video, and cautioned Kuckelman about being alone with a student. Lilly was told that he had done everything he could by McHardie. (Lilly Dep. 59:22-60:5). Even if we are to assume MacHardie was not consulted, the actions taken by Lilly were not deliberately indifferent. Any failure to comply with USD 342 policies is irrelevant. *Rost*, 511 F.3d at 1122 (finding that the school's violation of its own policy "sound[ed] in negligence, not deliberate indifference").

Even if the Court finds that Lilly actually knew of and acquiesced in the abuse, he is protected by qualified immunity in his individual capacity. "Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019).

> A constitutional right is clearly established if it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. The plaintiff must show there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. Generally, existing precedent must have placed the statutory or constitutional question beyond debate for a right to be clearly established.

*Id.* (internal citations and quotations omitted). Finally, "clearly established law should not be defined at a high level of generality." *Id.* (citation omitted).

Here, H.W.'s claimed rights to equal protection, bodily integrity, and to be free of rape, sexual assault, and sexual harassment, Doc. 1 at 17 ¶¶ 78-79, 19 ¶ 91, are a given but defined at

too high a level of generality. H.W. must cite precedent demonstrating beyond debate a reasonable official would have understood Lilly's actions, given the information he had at the time, violated H.W.'s rights. No known precedent suggests an official is liable for believing the victim, even after informing the victim's parents and law enforcement of an odd circumstance.

Finally, any official capacity claims against Lilly are redundant of the claims against USD 342 and should be dismissed. *See King v. City of Crestwood, Missouri*, 899 F.3d 643, 650 (8th Cir. 2018); *Aubert*, 2019 WL 1239435, at *12 (discussing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).

## III. Because Defendants are Immune Under the Kansas Torts Claims and Coverdell Acts and The Sexual Abuse Was Not Reasonably Foreseeable, Defendants Were Not Negligent.

H.W. brings a state negligence claim against both defendants for failure to protect H.W. and supervise Kuckelman. Doc. 56 at 6 ¶ 6. Defendants are immune under the Kansas Torts Claims Act ("KTCA") and the Coverdell Act. Regardless, they were not negligent.

### A.   Defendants Are Immune Under the KTCA and Coverdell Acts.

#### 1.   Defendants are immune for failure to enforce Kansas reporting laws and for the adoption and enforcement of USD 342 policies.

USD 342 is a "governmental entity" for purposes of the Kansas Torts Claims Act. K.S.A. 75-6102(b)-(c). Under K.S.A. 75-6104(c)-(d),

> A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from . . . (c) enforcement of or failure to enforce a law, whether valid or invalid, including, but not limited to, any statute, rule and regulation, ordinance or resolution; (d) adoption or enforcement of, or failure to adopt or enforce, any written personnel policy which protects persons' health or safety unless a duty of care, independent of such policy, is owed to the specific individual injured.

*Id.* Accordingly, defendants cannot be liable for failure to comply with Kansas mandatory

reporting laws. *See Kansas State Bank & Tr. Co. v. Specialized Transp. Servs., Inc.*, 249 Kan. 348, 370-71, 819 P.2d 587 (1991) (holding that Kansas's reporting law does not create a duty to individuals injured because of a statutory violation).  Nor can defendants be liable for failing to adopt or enforce USD 342 policies. *Compare J.L. v. Royal Valley U.S.D. 337*, No. 19-CV-02651-TC, 2021 WL 4197720, at *9 (D. Kan. Sept. 15, 2021) (holding the policy exception applies only when the duty of care arises from the adopted policy in question).

### 2. Defendants are shielded by KTCA discretionary immunity for formulation of USD 342's sexual harassment policies.

The discretionary function exception, K.S.A. § 75-6104(e), provides that government entities will not be liable for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion is abused and regardless of the level of discretion involved." *Id.* The types of discretionary decisions that Kansas law places "beyond judicial review" are those that "involve some element of policy formulation." *Kan. State. Bank*, 249 Kan. at 365.

Accordingly, defendants cannot be liable for the formulation of USD 342 policies or their discretionary decisions such as allowing a single-student class. *See Nero v. Kansas State Univ.*, 253 Kan. 567, 586, 861 P.2d 768, 782 (1993) (holding a university's decision to provide student housing was discretionary but "[o]nce that discretionary decision was made, [the university] had a legal duty to use reasonable care under the circumstances in protecting the occupants of the coed housing unit from foreseeable criminal conduct while in a common area").

### 3. The Coverdell Act shields Lilly and the KTCA extends immunity to USD 342 in so far as the Coverdell Act shields Lilly.

The Coverdell Act immunizes teachers and administrators for ordinary negligence in the scope of their employment, where their acts or omissions were carried out in conformity with

federal and local law in an effort to maintain order. 20 U.S.C. §§ 7943(6), 7946. The purpose of the Act "is to provide teachers, principals, and other school professionals the tools they need to undertake reasonable actions to maintain order, discipline, and an appropriate educational environment." 20 U.S.C. § 7942. The Act provides that it preempts any inconsistent state law except for state law that provides additional teacher liability protection (like the KTCA). 20 U.S.C. § 7945(a).

H.W.'s negligent supervision claim against Lilly is barred by Coverdell Act immunity. *Nkemakolam v. St. John's Military Sch.*, 890 F. Supp. 2d 1260, 1263 (D. Kan. 2012). In *Nkemakolam*, the Act was applied to preclude a claim against the school's president stemming from student-on-student bullying where there were no allegations of willful, criminal, grossly negligent, reckless, or flagrantly indifferent behavior by the school official. The court held that allegations that a school administrator knew about the "dangerous propensities" of the bully or that he promised the victim's mother he would protect the victim were not enough to overcome the immunity provided in the Act. *Id.* Accordingly, Lilly is immune from H.W.'s negligent supervision claim in so far as it alleges negligence.

Under the KTCA adoptive immunity provision, USD 342 is also immune from respondeat superior liability based on Lilly's or other school officials' immunized conduct. K.S.A. § 75-6104(i) ("A governmental entity . . . shall not be liable for damages resulting from . . . any claim which is . . . for injuries or property damage against an officer, employee or agent where the individual is immune from suit or damages."); *Sanchez, ex rel. Sanchez v. Unified Sch. Dist. 469*, 50 Kan. App. 2d 1185, 1201, 339 P.3d 399, 411 (2014) ("[T]he adoptive immunity exception to liability reflects an intent by the legislature to ensure that, in applying the doctrine of respondeat superior, a governmental entity has available to it the same defenses and limitations on liability

that would be available to the private employer in comparable circumstances."); *compare J.L.*, 2021 WL 4197720, at \*10 (holding a school district was immune for the acts of its employee, not its own acts).

**B.      Because the Sexual Abuse Was Not Foreseeable, Defendants Did Not Negligently Supervise H.W. and Kuckelman.**

Even if the Court rejects one or more aspects of defendants' immunity, they were not negligent on the merits. Negligence in Kansas requires (1) a duty, (2) breach, and (3) causation, and (4) damages. *Reardon for Est. of Parsons v. King*, 310 Kan. 897, 903, 452 P.3d 849, 854 (2019). "An incident not reasonably foreseeable by the exercise of reasonable care and prudence is not sufficient grounds for a negligence action." *Beshears By & Through Reiman v. Unified Sch. Dist. No. 305*, 261 Kan. 555, 563–64, 930 P.2d 1376, 1383 (1997).

Under Kansas law, high schools have a duty "to properly supervise students and to take reasonable steps to protect their safety" while on school premises. *Dunn v. Unified Sch. Dist. No. 67*, 40 P.3d 315, 326 (Kan. Ct. App. 2002). Additionally, an employer owes a duty of reasonable care under the circumstances to prevent harm to third parties caused by its employees when "the employer had reason to believe that an undue risk of harm to others would exist as a result of the employment of the alleged tortfeasor." *Kansas State Bank*, 249 Kan. 348 at Syl. ¶ 1.

> The employer is subject to liability only for such harm as is within that risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee that the employer had reason to believe would be likely to cause harm.

*Id.* The 10th Circuit has found that the state "reason to believe" standard largely overlaps the Title IX "actual knowledge" prong. *Escue v. N. OK Coll.*, 450 F.3d 1146, 1156 (10th Cir. 2006). Under either duty owed H.W., her sexual abuse was not reasonably foreseeable.

In *Kansas State Bank*, the case was "close," but the court held there was sufficient evidence to create a triable issue on foreseeability of sexual abuse because the bus driver was hot-tempered; called the children names; "out of control"; "emotionally disturbed"; the six-year-old child's teacher believed her behavioral problems were possibly caused by exposure to sexual conduct; and the principal heard the complaints, saw the child on the driver's lap, and acknowledged a possibility the driver had molested the child before hearing the child's allegations. 249 Kan. at 363.

Here, H.W.'s abuse was not reasonably foreseeable. USD 342's policies were within the standard of care for Kansas. (DSOF 97). And sexual harassment training was completed pursuant to Kansas requirements. (DSOF 98). Davis instructed her teachers not to use social media to communicate with students. (DSOF 25). She checked on Kuckelman's and H.W.'s class. (DSOF 18). And H.W. never expressed concern with the class arrangement. (DSOF 16).

Lilly did not know H.W. was in a one-on-one class with Kuckelman with the door shut. (DSOF 22). Other than the October incident, he was not informed of any concerns. (DSOF 68). He thought the incident was odd and contacted school resource officer McHardie for guidance. (DSOF 43). Lilly informed H.W.'s parents and the school resource officer of the video and questioned H.W. and Kuckelman. McHardie told him he had done all he could. (DSOF 61). For the above reasons—particularly H.W.'s and her parents' denial of abuse—there was no reason to believe that Kuckelman was a predator requiring either a formal report to DCF, increased supervision, or revised policies. *See also* Section I.A. (citing authority on the "actual knowledge" prong).

Next, H.W. cannot demonstrate a genuine issue of a causal connection between the alleged breaches of reasonable care and H.W.'s injury. To survive summary judgment, the plaintiff must

provide evidence supporting a reasonable inference that the defendant's conduct more likely than not caused the injuries sustained. A plaintiff cannot accomplish this task by relying on conjecture, speculation, or surmise. *Drouhard-Nordhus v. Rosenquist,* 301 Kan. 618, 624-25, 345 P.3d 281 (2015) (finding generalized references to be speculative and inadequate to meet plaintiff's causation burden). Mere possibility of causation is insufficient and if "the probabilities are at best evenly balanced," courts must enter judgment in favor of the defendant. *Yount v. Deibert,* 282 Kan. 619, 628, 147 P.3d 1065 (2006). Finally, H.W.'s denial of sexual abuse when questioned is an intervening factor breaking any causal connection.

Lastly, USD 342 cannot be held liable for the alleged abuse by defendant Kuckleman and owes him no defense or indemnity under the Kansas Tort Claims Act. The Kansas Tort Claims Act ("KTCA") provides that a governmental entity is liable "for damages caused by the negligent or wrongful act or omission of any of its employees ***while acting within the scope of their employment*** under circumstances where the governmental entity, if a private person, would be liable . . ." K.S.A. 75-6103 (emphasis added).  School districts are governmental entities for KTCA purposes.  *See* K.S.A. 75-6102(b) and (c). A governmental entity may refuse to provide for the defense of an employee if (1) the alleged act or omission was not within the scope of the employee's employment; or (2) the employee acted or failed to act because of actual fraud or malice.  *See* K.S.A. 75-6108(c).

Sexual intercourse by a teacher with a student cannot be within the scope of Kuckleman's employment at USD 342. As a matter of law, defendant USD 342 in entitled judgment, pursuant to K.S.A. 75-6108(c), that (1) the alleged conduct of defendant Kuckleman was not an act or omission within the scope of his employment, (2) the alleged conduct of defendant Kuckleman

amounts to actual malice, (3) USD 342 is not vicariously liable for the alleged acts of Kuckleman, and (4) USD has no duty to defend or indemnify Kuckleman.

As a matter of law, the childhood sexual abuse of a student by an educator or vice principal is not within the scope of employment. *See Wayman v. Accor N. Am., Inc.*, 45 Kan.App.2d 526, 533, 251 P.3d 640 (2011) (off-duty motel manager was not performing any act for his employer and was not within the scope of employment when striking guest while intoxicated).

An employee of a governmental entity may also be denied defense or indemnity under the KTCA if the conduct amounts to actual malice. K.S.A. 75-6108(c)(2). Actual malice requires a showing of (1) "a knowing or reckless disregard of the truth," *Ruebke v. Globe Commc'ns Corp.*, 241 Kan. 595, 602, 738 P.2d 1246 (1987), or "actual evil-mindedness or specific intent to injure." *Turner v. Halliburton Co.*, 240 Kan. 1, 8, 722 P.2d 1106 (1986). "[A]n intent to injure can be inferred from the nature of the act and the foreseeability of harm flowing naturally from that act." *State Farm Ins. Cos. v. Gerrity*, 25 Kan.App.2d 643, 646, 968 P.2d 270 (1998). Actual malice can be inferred from Kuckleman's alleged intentional criminal conduct, as argued *supra*. Thus, USD 342 has no obligation to defend or indemnify him.

Kansas courts have determined that public policy in Kansas prohibits insurance coverage for intentional injury of others, like child molestation or abuse. *See Thomas v. Benchmark Ins. Co.*, 285 Kan. 918, 922, 179 P.3d 421, 425 (2008) (intentional injury exclusion applied to driver attempting to elude police at high speed). Also, the District of Kansas stated, "the expansion of insurance coverage to protect the insured from damages arising out of the sexual molestation of children is beyond the realm of public policy." *Troy v. Allstate Ins. Co.*, 789 F. Supp. 1134, 1136 (D. Kan. 1992) (homeowner's policy did not insure against childhood sexual abuse). "The insured must have intended both the act and to cause some kind of injury or damage. Intent to cause the

injury or damage can be actual or it can be inferred from the nature of the act when the consequences are substantially certain to result from the act." *Benchmark Ins. Co.,* 285 Kan. at 933, 179 P.3d at 431.  Sexual molestation of a child by an adult, "has been found by a majority of federal jurisdictions…to constitute intentional harm from its very nature." *Troy.* 789 F. Supp. at 1136; *State Farm Fire & Cas. Co. v. Smith*, 907 F.2d 900, 902 (9th Cir. 1990) Whether viewed as conduct outside the scope of employment or as actual malice, the school district is not vicariously liable for Kuckleman's conduct has no obligation to defend or indemnify him.

## CONCLUSION

For the reasons set forth above, defendants are entitled to judgment as a matter of law and pray for an order granting them judgment, dismissing plaintiff's claims with prejudice, and for their costs.

Respectfully submitted,

/s/ Terelle A. Mock
Terelle A. Mock                                         #21465
Brian C. Mauldin                                       #28636
FISHER, PATTERSON, SAYLER & SMITH, L.L.P.
3550 S.W. 5th Street
Topeka, KS  66606
(785) 232-7761 | (785) 232-6604 – fax
E-mail: tmock@fpsslaw.com
            bmauldin@fpsslaw.com
**Attorney for Defendants McLouth U.S.D. 342 and Steven Lilly**

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2022, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

> Daniel R. Zmijewski
> Christopher Dove
> DRZ LAW, LLC
> 8700 State Line Rd., Suite 305
> Leawood, KS 66206
> dan@drzlawfirm.com
> chris@drzlawfirm.com
> **Attorneys for Plaintiff**

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:  No one.

/s/ Terelle A. Mock
Terelle A. Mock